IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RICHARD S. STACK, M.D.,      )
                             )
              Plaintiff,     )
                             )
         v.                  )        1:12CV148
                             )
ABBOTT  LABORATORIES,  INC.  et)
al.,                         )
                             )
              Defendants.    )


**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

This is an action by Plaintiff Dr. Richard S. Stack ("Stack") to recover the payment of royalties. Before the court is the motion of Defendants Abbott Laboratories, Inc., Abbott Vascular, Inc., Abbott Vascular Solutions, Inc., and Abbott Cardiovascular Systems, Inc. to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 13.) For the reasons set forth below, Defendants' motion will be granted in part and denied in part.

**I.  BACKGROUND**

The complaint, viewed in the light most favorable to Stack, alleges the following:

Stack is a prominent interventional cardiologist who has been a leader in developing stent technology. (Doc. 1 ¶ 1.) He

is currently Professor Emeritus of Medicine in Cardiology at Duke Medical School. (Id. ¶ 27.) Beginning in 1985, he worked with Advanced Cardiovascular Systems, Inc. ("ACS"), and its successors as a consultant. (Id. ¶¶ 37–38.) In 1991, Stack signed a "Consultant and Know-How Agreement" with ACS, providing ACS with exclusive access to his consulting services, particularly in relation to the development of technology for bioabsorbable stents. (Id. ¶¶ 47–48.) The parties renewed this agreement in 1994 because Stack had made considerable progress; at that time, ACS agreed to pay Stack a consulting fee and royalties to begin developing non-bioabsorbable stent technology. (Id. ¶¶ 59–64.) Between 1995 and 2001, Stack and ACS collaborated on research and development related to non-bioabsorbable stent technology. (Id. ¶ 68.) During this span, ACS was acquired by and became a subsidiary of Guidant Corporation ("Guidant"). (Id. ¶¶ 85–86.)

By 2001, Stack had become an "internationally renowned leader" in the field of stent technology. (Id. ¶ 88.) On January 1, 2001, Stack and Guidant entered into a Consulting Agreement (the "Agreement") that superseded the prior agreements between Stack and ACS. (Id. ¶¶ 89–90.) In return for exclusive access to Stack's services, Guidant agreed to pay Stack a consulting fee as well as royalties for the development of certain patents and technology. (Id. ¶¶ 91–92.) In particular,

2

the Agreement called for Stack to receive a royalty for each "Royalty Bearing Product," specifically including three types of "royalty bearing technology": "Bioabsorbable Stent Technology; Drug Delivery Technology; and Peripheral Technology." (<u>Id.</u> ¶¶ 94–95, 97.) The Agreement required Guidant to pay royalties amounting to 1.25 percent of net sales on products utilizing Bioabsorbable Stent Technology (<u>id.</u> ¶ 99), 0.75 percent on products utilizing Drug Delivery Technology (<u>id.</u> ¶ 101), and 0.5 percent on products utilizing Peripheral Technology (<u>id.</u> ¶ 104). All royalties under the agreement were due within 45 days of the end of each calendar quarter in which an obligation occurred. (<u>Id.</u> ¶ 105.) In addition, Guidant was required to pay Stack a "Launch Payment" of $480,000 within six months of full commercial launch of any product utilizing Drug Delivery Technology, with the exception of a heparin-coated stent. (<u>Id.</u> ¶ 107.)

Stack alleges that the Agreement did not take effect until May 2002, when he received a letter from John M. Capek ("Capek"), President of Guidant, assuring him that the definitions of "Royalty Bearing Product" and "Drug Delivery Technology" were broad enough to include a particular type of drug-eluting stent called paclitaxel-coated stents. (<u>Id.</u> ¶¶ 111–13.) It was only at this point that Stack signed the

3

Agreement. (Id. ¶ 123.) The term of the Agreement was through December 31, 2010. (Id. ¶ 106.)

On August 28, 2006, Stack was informed by letter that Guidant had sold ACS and that, effective April 21, 2006, the Abbott family of companies had acquired Guidant's interests in ACS and its Vascular Intervention and Endovascular Solutions businesses. (Id. ¶ 128.) The letter, attached to Stack's complaint and incorporated by reference, stated that Defendants Abbott Cardiovascular Systems, Inc. and Abbott Vascular Solutions, Inc. assumed all rights and responsibilities in relation to the Agreement. (Doc. 1-2 at 2.)[1]

Stack alleges that since Defendants took over ACS's operations, they have breached the Agreement in various respects. Specifically, Defendants have marketed a product known as Xience V in Europe since 2006, which Stack alleges is a Royalty Bearing Product utilizing Drug Delivery Technology. (Doc. 1 ¶¶ 134, 157-58.) Stack was personally involved in the development of Xience V for Guidant (id. ¶ 160), and Defendants did not change any of the product's vital characteristics (id. ¶¶ 173, 175, 177, 179, 181, 183). In fact, Defendants were developing their own competitor to Xience V, called "ZoMaxx," but stopped the development once they acquired Guidant. (Id.

---

[1] For purposes of clarity, the Abbott family of companies will be referred to collectively as "Defendants."

4

¶ 190.) Stack alleges that sales of Xience V worldwide have totaled "in excess of $2,500,000,000," and that Defendants have collected royalties "in excess of $50,000,000" from Boston Scientific in return for a license to manufacture Xience V. (Id. ¶¶ 195–98.) Stack also alleges that Xience V had a full commercial launch in 2006, entitling him to a payment of $480,000 pursuant to the Agreement. (Id. ¶¶ 199–200.) To that end, he claims that Capek, who had become Chief Executive Officer of one of the subsidiary Defendants, admitted to him over the phone in 2006 that Defendants owed Stack the Launch Payment for Xience V. (Id. ¶ 200.) Finally, Stack claims that Defendants have sold additional products fitting the definitions contained of the Agreement, entitling him to royalties in excess of $50,000,000. (Id. ¶ 206.)

Stack also claims that Defendants took several steps in an attempt to conceal his involvement in the development of Xience V and other products. With respect to Xience V, he alleges that in the product packaging Defendants intentionally removed a reference to United States Patent No. 6,753,071 (the "Pacetti Patent"), which directly refers to United States Patent No. 5,059,211, a patent for one of Stack's bioabsorbable stents. (Id. ¶¶ 209–10.) He also alleges that Defendants systematically excluded his name as an inventor on several patent applications, in violation of the Agreement and with the intent to diminish

his value to competitors by damaging his reputation. (<u>Id.</u> ¶¶ 215-24.)

In his complaint, Stack alleges two causes of action: breach of contract; and violation of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA" or "the Act"), N.C. Gen. Stat. § 75-1.1 <u>et</u> <u>seq</u>. He contends that Defendants breached the Agreement by failing to pay the $480,000 Launch Payment for Xience V, failing to pay royalties for Xience V and other products, and removing Stack's name as an inventor on several patent applications. He also contends that Abbott's removal of the Pacetti Patent from the product packaging of Xience V and its removal of Stack's name from the list of inventors on several Abbott patent applications, separately and in conjunction with the breach of the Agreement, constitute unfair and deceptive trade practices in violation of North Carolina's UDTPA.

Defendants move to dismiss on several grounds. (Docs. 12-13.) First, Defendants move to dismiss both claims in their entirety as against Abbott Laboratories, Inc. and Abbott Vascular, Inc. on the ground that the complaint implicates neither Defendant in wrongdoing. Second, Defendants contend that Stack's claims are time-barred to the extent they seek to reach back more than four years. Third, Defendants move to dismiss all contract claims relating to products other than

6

Xience V because those products were not specifically identified in the complaint. Fourth, Defendants argue the complaint fails to state a claim under the UDTPA. Each argument will be addressed in turn.

## II.  ANALYSIS

### A.  Standard of Review

The pleading standards are well known and need be identified only briefly. Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557).

### B.  Motion to Dismiss Abbott Laboratories, Inc. and Abbott Vascular, Inc.

Defendants argue that Defendants Abbott Laboratories, Inc. (the parent company), and Abbott Vascular, Inc. have not been implicated in any wrongdoing in the complaint and thus should be

dismissed. Stack contends that an August 28, 2006 letter he received from the assistant secretary and senior counsel of Defendants ACS and Guidant Endovascular Solutions, Inc. demonstrates that Abbott Laboratories, Inc. and Abbott Vascular, Inc. have liability. (Doc. 20 at 24-25.) The letter states in relevant part:

> On behalf of Advanced Cardiovascular Systems, Inc. ("ACS") and Guidant Endovascular Solutions, Inc. ("GES"), I am writing to notify you that effective April 21, 2006, Guidant Corporation and its affiliates *sold to Abbott Laboratories and its affiliates* all of the assets of Guidant Corporation and its affiliates related to Guidant's Vascular Intervention and Endovascular Solutions businesses (the "Sale") and, *as a result of the Sale, ACS and GES (formerly subsidiaries of Guidant Corporation) became subsidiaries of Abbott Laboratories*. Also as part of the sale, Guidant Corporation assigned all of its rights and obligations under the Contract to ACS and GES, and ACS and GES assumed all of Guidant's rights and agreed to discharge and perform all of Guidant Corporation's obligations under the Contract.
>
> *        *        *
>
> ACS and GES and Abbott Laboratories look forward to continuing our strong business relationship with you.

(Doc. 1-2 at 2 (emphasis added).)

The letter contains potentially contradictory statements. On the one hand, it represents that Guidant's assets were sold to "Abbott Laboratories and its affiliates" and closes with the statement that "Abbott Laboratories look[s] forward to continuing our strong business relationship with you," supporting Stack's claim that at least Abbott Laboratories, Inc.

8

may be liable for any recovery. On the other hand, the letter goes on to say that Guidant's assets related to its ACS and Guidant Endovascular Solutions, Inc. businesses "became subsidiaries of Abbott Laboratories." This supports Defendants' argument that there is no basis to hold a parent responsible for a subsidiary's liability. See United States v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." (internal quotation marks omitted)). Although these statements are contradictory, when viewed in the light most favorable to Stack (as they must be at this early stage) they make a claim as to Abbott Laboratories, Inc., plausible. The motion to dismiss as to this Defendant will therefore be denied at this time.

The motion to dismiss as to Abbott Vascular, Inc. rests on stronger grounds. The only link between it and Stack's claims is the fact that the August 28, 2006 letter was written on letterhead bearing its name. However, nowhere in the letter does the writer purport to be writing on behalf of that company, and nothing in the complaint implicates it. Therefore, the motion to dismiss Abbott Vascular, Inc. will be granted, but without prejudice as it may be subject to being cured through additional pleading. See Boykin Anchor Co. v. AT&T Corp., No.

9

5:10-CV-591-FL, 2011 WL 1456388, *3-*5 (E.D.N.C. Apr. 14, 2011).[2]

### C. Breach of Contract

#### 1. Statute of Limitations

Because the statute of limitations is an affirmative defense that must be proven by a defendant by a preponderance of the evidence, this court can reach the merits of the issue at the Rule 12(b)(6) stage only "if all facts necessary to the [statute of limitations] defense 'clearly appear[] on the face of the complaint.'" Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (quoting Richmond, Fredericksburg & Potomac R.R. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993)(emphasis deleted)). A dismissal of a claim as time-barred at the motion to dismiss stage occurs in "relatively rare circumstances." Id.

The parties agree that the Agreement is governed by California law and therefore appear to agree that its four-year statute of limitations applies. See Cal. Code Civ. Proc. § 337. The complaint was filed February 13, 2012. Thus, all claims accruing before February 13, 2008, would fall outside the limitations period unless there is a basis to determine otherwise.

Abbott points to the complaint's allegation that Stack was aware of Xience V's launch in 2006 and began demanding payment

---

[2] For the remainder of the opinion, the three remaining Defendants will be referred to collectively as "Abbott."

10

"shortly" thereafter. (Doc. 1 ¶¶ 105, 107, 193-200.) Abbott contends that Stack was therefore aware of his rights as of 2006 such that any claim outside the four-year statute of limitations is time-barred. Stack responds that Abbott is equitably estopped from asserting the statute of limitations as a defense because the complaint alleges that "[s]hortly after the commercial launch of Xience V in 2006," Abbott, through Capek, "acknowledged to Dr. Stack in a telephone conversation that Abbott is obligated to pay the Launch Payment ($480,000.00) for Xience V." (Id. ¶ 200.)

Where a claim is clearly outside a statute of limitations, "[a]t the motion to dismiss stage, the plaintiff has the burden of pleading facts that would support a finding of equitable estoppel." Jones v. Shooshan, 855 F. Supp. 2d 594, 605 (E.D. Va. 2012); see also Mullinax v. Radian Guaranty, Inc., 199 F. Supp. 2d 311, 326 (M.D.N.C. 2002). Under California law, "[t]he elements of equitable estoppel are: (1) the party to be estopped must be apprised of the facts; (2) that party must intend that his or her conduct be acted on, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and (4) the party asserting the estoppel must reasonably rely on the conduct to his or her

injury." <u>Honig v. San Francisco Planning Dep't</u>, 127 Cal. App. 4th 520, 529, 25 Cal. Rptr. 3d 649, 655 (2005).

Here, the complaint fails to plead facts to make an equitable estoppel claim plausible. Specifically, the complaint alleges only that Capek acknowledged that "Abbott is obligated to pay the Launch Payment" for Xience V. (Doc. 1 ¶ 200.) This does not support an inference that Stack could have reasonably relied on the acknowledgment for almost four years to forego filing suit, especially where Stack pleads that under the terms of the Agreement such payments were due within 45 days of every calendar quarter in which a royalty obligation occurs (<u>id.</u> ¶ 105) and that he made requests for payment that were refused by Abbott (<u>id.</u> ¶ 204). Lacking is any allegation that Abbott made a promise to pay or misled Stack in any way into believing he would receive payment. <u>Cf.</u> <u>Lantzy v. Centex Homes</u>, 31 Cal. 4th 363, 384, 2 Cal. Rptr. 3d 655, 673 (2003) (finding possible application of equitable estoppel "if one potentially liable for a construction defect represents, while the limitations period is still running, that all actionable damage has been or will be repaired, thus making it unnecessary to sue").

Therefore, the court finds that the complaint on its face makes clear that all contract-based claims prior to February 13,

2008 are barred by the statute of limitations.[3]  Abbott's motion to dismiss will be granted to that extent.  Because this defect may be curable through re-pleading, the dismissal will be without prejudice.

### 2.  Claims relating to other products

Abbott argues that, to the extent Stack seeks damages for breach of contract based on failure to pay royalties or Launch Payments for products other than Xience V, these claims should be dismissed because they fail to provide Abbott any notice as to which products are at issue.  Stack contends that his claim for unpaid royalties on Royalty Bearing Products is specific enough to provide notice under the federal pleading standards.

"A complaint 'need only give the defendant fair notice of what the claim is and the grounds upon which it rests.'" Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (quoting Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (internal quotation marks omitted)).  Post-Twombly and Iqbal, a plaintiff's burden is to state factual allegations to make a claim plausible.  See, e.g., Moore v. BASF Corp., No. 11-1001, 2011 WL 5869597, at *6 (E.D. La. Nov. 21, 2011) (concluding it was unnecessary for the plaintiff in a negligence suit to name specific products or even specific places or dates

---

[3] This would include all claims for royalty payments that accrued before February 13, 2008.

13

where the alleged exposure to benzene-containing products took place, so long as the facts pleaded allow the court to draw the plausible inference that the defendant was negligent).

Here, Stack has pleaded a plausible breach of contract claim by alleging that Abbott has failed to pay royalties and Launch Payments relating to three specifically-defined product types that Abbott agreed were "Royalty Bearing Products" under the Agreement: "Bioabsorbable Stent Technology"; "Drug Delivery Technology"; and "Peripheral Technology." The Agreement allegedly defines Bioabsorbable Stent Technology to be "technology related to the making, using, distributing or selling of stents that are designed to be eroded, dissolved, or absorbed." (Doc. 1 ¶ 98.) It defines Drug Delivery Technology as:

> [T]echnology substantially developed, in whole or in part, by ACS or Dr. Stack and his Collaborators prior to December 31, 2000 using monies supplied by ACS related to the making and using of Stents intended to be employed in conjunction with a dilatation catheter or other analogous device, composed in whole or in part of metal and/or bioabsorbable or non-bioabsorbable polymers, for drug delivery.

(Id. ¶ 100.) The Agreement, as amended, defines Peripheral Technology as:

> [T]echnology relating to the making, using and selling of medical devices for use in applications in the human peripheral vasculature (i.e., all vessels in the human body, including, without limitation, the carotids, but excluding coronaries, intracranial vessels and the aorta), and biliary tree, which are

14

> developed, in whole or in part, by Dr. Stack and his
> Collaborators prior to December 31, 2000.

(Id. ¶ 103.)

If Abbott was satisfied, as it necessarily was, to have these definitions serve as the basis for assessing its liability for payment of royalties to Stack (in potentially large financial amounts), the court is not persuaded by Abbott's current claim that it now lacks adequate notice of which of its products Stack's lawsuit is about. In breach of contract actions such as this, unlike patent infringement cases, the relationship between the contracting parties is preexisting, so it is easier for the defendant to understand what products the suit concerns. For this reason, the cases relied on by Abbott are distinguishable. Cf. Lam v. General Mills, Inc., 859 F. Supp. 2d 1097, 1101 (N.D. Cal. 2012) (plaintiff granted leave to amend where her allegation of false and misleading statements as to defendant's Fruit Roll-Ups and Fruit by the Foot "as well as other similar products" was found to be inadequate); Static Control Components, Inc. v. Future Graphics, LLC, No. 07CV00007, 2008 WL 160827 (M.D.N.C. Jan. 15, 2008) (granting motion for more definite statement where the plaintiff failed to identify the products allegedly being infringed sufficient to provide defendant adequate notice).

Of course, to survive summary judgment and to prevail at trial, Stack will have to prove damages relating to specific products. At this stage, however, Stack has sufficiently pleaded his breach of contract claim, and Abbott's motion to dismiss on this basis will be denied.

**D. UDTPA Claim**

To establish a *prima facie* claim for an unfair or deceptive trade practice under North Carolina's UDTPA, a plaintiff must show that (1) the defendant committed an unfair or deceptive act or practice (2) that was in or affecting commerce and (3) proximately caused injury. Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). An act or practice is unfair "if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," and is deceptive "if it has the capacity or tendency to deceive." Ace Chem. Corp. v. DSI Transp., Inc., 115 N.C. App. 237, 247, 446 S.E.2d 100, 106 (1994) (internal citations and quotations omitted).

Stack's complaint predicates a UDTPA claim on three alleged wrongs by Abbott: failure to pay royalties due Stack; removal of Stack's name from certain Abbott patent applications; and removal of the reference to Stack's work from Abbott's Xience V product packaging. Defendants argue that Stack's UDTPA claim should be dismissed because Stack's relationship with Abbott is akin to that between employer and employee, which is exempted

16

from the statute, and does not affect commerce. Stack contends that the presence of a contract between him and Abbott removes the claim from the employer-employee context and contends that Abbott's conduct in eliminating his name as inventor from certain patent applications and reference to the Pacetti Patent on Xience V product packaging affects commerce. Abbott responds, alternatively, that any claim regarding patents under the UDTPA is preempted by federal patent law. These contentions will be addressed in turn.

In White v. Thompson, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010), the North Carolina Supreme Court explained that the UDTPA was intended to apply to two situations: "(1) interactions between businesses, and (2) interactions between businesses and consumers." Consequently, "any unfair or deceptive conduct contained solely within a single business is not covered by the Act." Id. at 53, 691 S.E.2d at 680. For this reason, North Carolina courts have generally exempted disputes arising from the employer-employee relationship from the UDTPA because they do not affect commerce. Durling v. King, 146 N.C. App. 483, 488, 554 S.E.2d 1, 4 (2001). However, North Carolina courts have not permitted an employee to shield from the UDTPA misconduct that affects commerce. E.g., Sara Lee Corp. v. Carter, 351 N.C. 27, 32–34 519 S.E.2d 308, 311–12 (1999)

17

(recognizing UDTPA claim against employee who formed business that competed unfairly with employer).

Stack notes that he was never an employee of Abbott's but was an independent contractor. The proper inquiry, however, "is not whether a contractual relationship existed between the parties, but rather whether the defendants' allegedly deceptive acts affected commerce." Maxwell v. Phillips, No. 1:06CV00510, 2007 WL 2156337 at *7 (M.D.N.C. Jul. 25, 2007) (quoting Durling, 146 N.C. App. at 488-89, 554 S.E.2d at 4 (citation and internal quotations omitted)). The analysis "usually depends upon the facts of each case and the impact the practice has in the marketplace." Id. (quoting Durling, 146 N.C. App. at 489, 554 S.E.2d at 4 (citing Pan Am. World Airways, Inc. v. United States, 371 U.S. 296 (1963))).

To the extent Stack bases his UDTPA claim on Abbott's failure to pay royalties, his claim is similar to that made in Durling. In that case the defendant, a salaried employee of Ty, Inc., maker of "Beanie Babies" stuffed toy animals, contracted separately with the three plaintiffs to assist him in managing his sales contracts. When a dispute arose over the payments the defendant owed the plaintiffs, they sued him for breach of contract, conversion, negligent retention and supervision, quantum meruit, and unfair and deceptive trade practices. The jury returned verdicts for the plaintiffs on the breach of

18

contract and UDTPA claims. The North Carolina Court of Appeals reversed the judgment based on the UDTPA verdict, finding that the defendant's actions in withholding commissions owed "were a breach of the contracts he had made with plaintiffs" but were not supported by any evidence that "the subject transactions had any impact beyond the parties' employment relationships." Durling, 146 N.C. App. at 489, 554 S.E. 2d at 4-5. See also Maxwell, 2007 WL 2156337, at *7 (holding that a dispute over royalties among former band members did not affect commerce).

Similarly, here Stack's claim for royalties affects only his relationship with Abbott under the consulting Agreement and not anyone else. The failure to pay them is alleged only to be a breach of that Agreement, and no more. To this extent, therefore, Stack's UDTPA claim predicated on failure to pay contractual royalties fails.

The remainder of Stack's UDTPA claim rests on his contention that Abbott removed his name from its patent applications and removed the Pacetti Patent (which allegedly in turn serves as a reference to Stack) on Xience V product packaging. Stack claims that these acts are substantial egregious and aggravating factors that enhance the breach of contract to support his UDTPA claim and are, in and of themselves, unfair and deceptive practices. Abbott contends, in

19

response, that these factors at best constitute separate breaches of the consulting Agreement, affect only the conduct between it and Stack, and do not constitute egregious circumstances to justify a treble damage award.

It is well settled that a mere breach of contract cannot sustain a UDTPA claim without a showing of "substantial aggravating circumstances." Griffith v. Glen Wood Co., 184 N.C. App. 206, 217, 646 S.E.2d 550, 558 (2007). Even an intentional breach of contract does not fall within the purview of the Act. See Bob Timberlake Collection, Inc. v. Edwards, 176 N.C. App. 33, 42, 626 S.E.2d 315, 323 (2006). The type of conduct that has been found sufficient to constitute a substantial aggravating factor has generally involved forged documents, lies, and fraudulent inducements. See, e.g., Garlock v. Henson, 112 N.C. App. 243, 246, 435 S.E.2d 114, 115–16 (1993) (finding forgery of a bill of sale and three years of lies to deprive plaintiff of money owed under a contract sufficient to sustain UDTPA claim); Foley v. L & L Int'l, Inc., 88 N.C. App. 710, 714, 364 S.E.2d 733, 736 (1988) (upholding UDTPA claim where defendant retained plaintiff's down payment for seven months while falsely claiming it had ordered the car); Mapp v. Toyota World, Inc., 81 N.C. App. 421, 426, 344 S.E.2d 297, 301, review denied, 318 N.C. 283, 347 S.E.2d 464 (1986) (holding breach of promise made to fraudulently induce contract sufficient to

sustain a UDTPA claim). Where the only acts alleged are themselves a breach of the contract between the parties, they will not support a UDTPA claim. See Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700, review denied, 332 N.C. 482, 421 S.E.2d 350 (1992) (affirming summary judgment against UDTPA counterclaim where bank's allegedly wrongful release of deed of trust constituted a breach of the note with borrower). The Fourth Circuit has cautioned, moreover, that it is inappropriate to allow a boilerplate UDTPA claim to ride piggyback on a contract action. Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998) (finding that "[g]iven the contractual center of this dispute, plaintiffs' [UDTPA] claims are out of place").

Here, Stack alleges that the failure to include his name as inventor on Abbott's patent applications violates section 4.4(d) of his consulting Agreement. (Doc. 1 ¶ 215.) The complaint also alleges that this conduct was egregious because it was committed "deliberately and in bad faith, to marginalize Dr. Stack's value in the marketplace, to advance Defendants' market position, and to enrich Defendants financially." (Doc. 20 at 20–21; Doc. 1 ¶ 221) Even assuming that to be true, such conduct was nevertheless within the contemplation of the parties when they crafted their contract. The claim is therefore one of contract interpretation and performance, which North Carolina

21

courts relegate to the arena of contract law, and not the stuff of treble damage awards. *See, e.g.*, *Deltacom, Inc. v. Budget Telecom, Inc.*, No. 5:10-CV-38-FL, 2011 WL 2036676, at *4-*5 (E.D.N.C. May 22, 2011) (granting motion for judgment on the pleadings where allegations of plaintiff's threats to terminate agreement, efforts to encourage defendant to continue performance while itself planning to breach, and refusal to comply with agreement, however unscrupulous, involve only the parties' understanding of and performance under the contract); *Hageman v. Twin City Chrysler-Plymouth, Inc.*, 681 F. Supp. 303, 306-07 (M.D.N.C. 1988) (concluding that claims regarding the essence of the contract are governed by contract law); *Mitchell v. Linville*, 148 N.C. App. 71, 75, 557 S.E.2d 620, 624 (2001) ("A violation of [the Act] is unlikely to occur during the course of contractual performance, as these types of claims are best resolved by simply determining whether the parties properly fulfilled their contractual duties."). Consequently, this conduct fails to constitute a sufficient egregious or substantial aggravating factor to make a UDTPA claim based on it plausible.

This leaves Stack's allegation that Abbott's removal of reference to United States Patent No. 6,753,071 (the Pacetti Patent) from the packaging reference material for Xience V starting in about 2008 constitutes a substantially aggravating

22

factor. Stack's claim rests on his allegation that the Pacetti Patent in turn refers to United States Patent No. 5,059,211 -- Stack's patent for bioabsorbable stents. (Doc. 1 ¶¶ 209-10.) Thus, by removing the reference to the Pacetti Patent, he claims, Abbott has "attempted to sever and conceal the direct connection between the work of Dr. Stack and Xience V" thus denying him "credit and recognition for the work and know how he has provided to Abbott." (Id. ¶¶ 210, 212.) Stack does not allege that this conduct violates the consulting Agreement.

This claimed factor is simply too attenuated to constitute an egregious or substantially aggravating factor in connection with a breach of a contract, or an unfair or deceptive trade practice. In essence, Stack argues that Abbott's removal of reference to *someone else's* patent from its product packaging caused him harm. Even assuming that to be the case, he fails to explain how he enjoys any right to insist on the placement of someone else's patent on any of Abbott's products. Any effect on Stack would be collateral, at best, and falls well outside the bounds of what North Carolina courts have recognized as supporting a UDTPA claim.[4] Thus, the UDTPA claim will be dismissed.[5]

---

[4] Stack's reliance on Sukumar v. Nautilus, Inc., 842 F. Supp. 2d 951 (W.D. Va. 2012), and Sara Lee Corp. v. Carter, 351 N.C. 27, 519 S.E.2d 308 (1999), is misplaced. In Sukumar, the district court denied the defendant's motion for summary judgment on a claim under Washington's Consumer Protection Act based on the defendant's placement of patent

23

## III. CONCLUSION

For the foregoing reasons, therefore,

IT IS ORDERED that Defendants' motion to dismiss (Doc. 13) is GRANTED IN PART, AND DENIED IN PART; Stack's breach of contract claims accruing before February 13, 2008, are DISMISSED WITHOUT PREJUDICE; Stack's UDTPA claim is DISMISSED; and the claims against Defendant Abbott Vascular, Inc. are DISMISSED WITHOUT PREJUDICE. In all other respects, the motion is DENIED.

/s/   Thomas D. Schroeder
United States District Judge

October 21, 2013

---

numbers on products that were not covered by those products. First, the Washington Consumer Protection Act's definition of commerce is much broader than the corresponding requirement of North Carolina's UDTPA. See id. at 964 ("'The CPA, on its face, shows a carefully GUDIWHG attempt to bring within its reaches every person who conducts unfair or deceptive acts or practices in any trade or commerce.'" (quoting Short v. Demopolis, 103 Wash. 2d 52, 61 691 P.2d 163, 168 (1984))). Second, even to the extent the district court's discussion of whether the false marking affected the public interest, id. at 964–65, is pertinent, Abbott's alleged conduct is distinguishable. In Sukumar, patent numbers were placed on products that had no relation to those products. This conduct could "cause a competitor to expend additional and unnecessary resources in attempting to avoid infringing upon what she thinks is a valid patent." Id. at 965 (citing Forest Grp., Inc. v. Bon Tool Co., 590 F.3d 1295, 1302–03 (Fed. Cir. 2009)). No such problems exist in this case; failing to list the Pacetti Patent on the Xience V product packaging has no effect on anyone other than Stack, for whom it allegedly represents the link between his work and the development of Xience V. In Sara Lee, the employee allegedly secretly created a network of four businesses and sold goods to the employer at inflated costs without disclosing his interest in the other companies. The North Carolina Supreme Court found that the defendant's status as an employee of the plaintiff did not protect him from treble damages liability under the UDTPA because he used his companies to unfairly and deceptively engage in commercial transactions with his employer. 351 N.C. at 34, 519 S.E.2d at 312.

[5]  In light of this conclusion, the court need not reach Abbott's argument that the UDTPA claim is preempted by federal patent law.