# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RICHARD S. STACK, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:12CV148 |
| | ) | |
| ABBOTT LABORATORIES, INC., et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court upon Defendants Abbott Laboratories, Inc., Abbott Vascular, Inc., Abbott Vascular Solutions, Inc., and Abbott Cardiovascular Systems, Inc.'s (collectively "Abbott") Motion for Summary Judgment. (Docket Entry 87.) Plaintiff Richard S. Stack, M.D., has filed a response. (Docket Entry 95.) Abbott thereafter filed a reply. (Docket Entry 96.) For the reasons stated herein, the Court will recommend that Abbott's motion be granted in part and denied in part.

## I. BACKGROUND

Dr. Stack filed this action against Abbott seeking to recover payment of royalties pursuant to a consulting agreement between the parties.[1] (*See generally* Am. Compl., Docket Entry 38.) Dr. Stack is a cardiologist highly recognized for his expertise in the development of drug eluting stent technology. (*Id.* ¶ 30.) Stents are devices used to assist blood vessels in

---

[1] Plaintiff filed his original complaint on February 13, 2012. (Compl., Docket Entry 1.) Thereafter, Abbott filed a motion to dismiss which was granted in part and denied in part. (*See* Order, Docket Entry 33.) Plaintiff then filed an amended complaint on December 17, 2013. (Am. Compl., Docket Entry 38.)

order to maintain proper blood flow. (*Id.* ¶ 31.) In or about 1985, Advanced Cardiovascular Systems, Inc. ("ACS"), a company engaged in the development and sale of medical devices, entered into a contractual relationship with Dr. Stack for consulting work. (*Id.* ¶¶ 36-37.) Between 1985 and 2011, ACS (and its successors) and Dr. Stack maintained this contractual relationship which required Dr. Stack "to provide consulting services to ACS and its successor; and prohibited [Dr. Stack] from providing such services to competitors of ACS and its successors." (*Id.* ¶ 38.)

Dr. Stack and ACS worked continuously over the years in research and development involving drug eluting stents, and beginning January 1, 2001, ACS and its parent company, Guidant Corporation ("Guidant"), entered into a contract (the "Consulting Agreement"), whereby Dr. Stack again agreed to provide exclusive consulting services to ACS regarding the development of stent technology. (*Id.* ¶¶ 68, 89, 91.) "In return and exchange for Dr. Stack's services, expertise and know how, Guidant agreed in the Consulting Agreement to pay Dr. Stack a consulting fee and, in addition, certain stated royalties for a variety of patents and technology." (*Id.* ¶ 92.) A royalty was required for every "Royalty Bearing Product" which the Consulting Agreement defined as:

> a product, apparatus or method, the practice, manufacturer, intended use or sale of which would, (a) but for this Agreement, infringe any Valid Claim (whether or not attributable to technology or Know-How developed by Dr. Stack) of at least one Patent assigned or licensed to Guidant by Dr. Stack under this Agreement (or the Peripheral Agreement or the Drug Delivery Agreement) or (b) utilize any Drug Delivery Technology, Peripheral Technology or Bioabsorbable Stent Technology.

(Consulting Agreement § 1.25, Docket Entry 88-2.) Drug Delivery Technology, which was deemed "royalty bearing," is defined by the Consulting Agreement as:

technology substantially developed, in whole or in part, by ACS or Dr. Stack and his Collaborators prior to December 31, 2000 using monies supplied by ACS related to the making and using of Stents intended to be employed in conjunction with a dilatation catheter or other analogous device, composed in whole or in part of metal and/or bioabsorbable or non-bioabsorbable polymers, for drug delivery.

(*Id.* § 1.8.) The Consulting Agreement required Guidant to pay royalty payments equal to three quarters of one percent (.75%) on net sales on products using drug delivery technology, (*see id.* § 5.2(e)), to be paid "within forty-five (45) days following the end of each calendar quarter in which such royalty obligations occur." (*Id.* § 5.2(m).)

In or about 2006, Abbott acquired Guidant, and thereafter became bound by the Consulting Agreement between Dr. Stack and Guidant. (Compl. ¶¶ 128, 132-33.) Abbott subsequently begin producing and selling Xience V, "an implantable support structure for an artery" which uses "technology that was substantially developed, in whole or part, by Dr. Stack" and is a royalty bearing product based upon the parties' Consulting Agreement. (*Id.* ¶¶ 146-47, 162, 170.) In a telephone conversation, Abbott's CEO, John Capek, acknowledged the Launch Payment owed to Dr. Stack as a result of the Xience V product. (*Id.* ¶ 212.) Dr. Stack has made requests for his Launch Payment and royalties for Xience V, and all other products pursuant to the Consulting Agreement. (*Id.* ¶ 215.) Dr. Stack also continued to provide his consulting services exclusively to Abbott. (*Id.* ¶ 214.) He alleges that Abbot has "failed and refused to pay Dr. Stack the Launch Payment for Xience V and royalties for products covered by Dr. Stack's royalty rights," which constitutes a breach of the Consulting Agreement. (*Id.* ¶¶ 216-17.) Dr. Stack seeks damages in excess of $30,000,000.00. (*Id.* ¶ 235.)

On February 18, 2016, Abbott filed the pending motion for summary judgment alleging that Dr. Stack's breach of contract claim is barred by the statute of limitations. (Docket Entry

87.) Specifically, Abbott asserts that: (1) Dr. Stack's claims for royalty payments for products covered under the Consulting Agreement (including Xience V and other drug eluting stents) are barred under the North Carolina statute of limitations; (2) the Consulting Agreement is not an installment contract; (3) the "Continuing Wrong" doctrine is inapplicable;[2] and (4) if the agreement is an installment contract, Abbott repudiated any obligation to make royalty payments. (Docket Entry 88 at 15-23.) For the reasons stated herein, the Court recommends Abbott's motion be granted in part and denied in part.

## II. DISCUSSION

Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then affirmatively must demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of

---

[2] In his opposition brief, Dr. Stack does not address this argument. This Court has previously recognized that "a party who fails to address an issue has conceded the issue." *Kinetic Concepts, Inc. v. Convatec Inc.*, No. 1:08CV00918, 2010 WL 1667285, at *8 (M.D.N.C. Apr. 23, 2010); *see also Brand v. N. Carolina Dep't of Crime Control & Pub. Safety*, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004) ("By failing to respond, Plaintiff concedes that he has not stated a [specific] claim."). Thus, the Court need not address this issue any further.

the case properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 247-48 (1986).

"[A]t the summary judgment stage, the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Similarly, "[c]redibility determinations . . . are jury functions, not those of a judge." *Id.* at 255. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." *Id.*; *see United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted "where a reasonable jury could reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005). However, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created," and judgment as a matter of law should be denied. *Id.* at 489-90.

<u>Analysis</u>

A. Governing Law

Abbott first argues that, with respect to the statute of limitations, North Carolina law governs rather than California law. (Docket Entry 88 at 17.) Dr. Stack contends that the choice of law provision in the Consulting Agreement, which applies California law, governs the parties' disputes, including the statute of limitations. (Docket Entry 95 at 21-23.)

"[I]n an action based upon diversity of citizenship, as here, the district court must 'apply the substantive law of the state in which it sits, including the state's choice of law rules.'" *Mendenhall v. Hanesbrands, Inc.*, 856 F. Supp. 2d 717, 723 (M.D.N.C. 2012) (citing *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.,* 386 F.3d 581, 599–600 (4th Cir. 2004)). Under North Carolina's traditional approach to conflict of law rules, "remedial or procedural rights are determined by lex fori, the law of the forum." *Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 854 (1988). "The question of what is procedure and what is substance is determined by the law of the forum state." *Id.* at 339, 368 S.E.2d at 856. Courts here "have consistently viewed statutes of limitation as procedural." *Wener v. Perrone & Cramer Realty, Inc.*, 137 N.C. App. 362, 365, 528 S.E.2d 65, 67 (2000); *see also Bardes v. Massachusetts Mut. Life Ins. Co.*, 932 F. Supp. 2d 636, 642 (M.D.N.C. 2013) ("North Carolina law controls procedural matters such as determining the statute of limitations."); *Ingersoll ex rel. Kehrt Revocable Living Trust v. Life Indus. Corp. of S. Carolina*, 698 F. Supp. 2d 552, 557 (E.D.N.C. 2010) ("[U]nder North Carolina's choice of law rules, a statute of limitations is procedural rather than substantive."); *Boudreau*, 322 N.C. at 340, 368 S.E.2d at 857 ("Ordinary statutes of limitation are clearly procedural . . . .").

6

The Consulting Agreement between the parties states that "this Agreement shall be governed by, construed and enforced in accordance with the domestic laws of the State of California, without regard to choice of law provisions." (John Capek Decl., Ex. 1 § 10.5, Docket Entry 88-2.) North Carolina typically gives effect to choice of law provisions in a contract.[3] *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). However, "this in no way influences the application of North Carolina's statute of limitations." *MedCap Corp. v. Betsy Johnson Health Care Sys., Inc.*, 16 F. App'x 180, 182 n.2 (4th Cir. 2001) (citation omitted);[4] *see also Eagle Nation, Inc. v. Mkt. Force, Inc.*, 180 F. Supp. 2d 752, 756 (E.D.N.C. 2001) (citation omitted) (notwithstanding concession of the parties, the court noted that North Carolina procedural law was applicable even though "the contract explicitly includes a choice of law provision specifying that out-of-forum law applies to the agreement, because the statute of limitations is a procedural, rather than a substantive, issue."). Having

---

[3] Plaintiff argues that certain individual terms used in the parties' choice of law provision have been construed to include disputes regarding the statute of limitations. (Docket Entry 95 at 21-22.) The Court notes that Plaintiff only supported this argument with two Fourth Circuit cases, *Bunker Holdings, Ltd. v. Green Pac. A/S*, 346 F. App'x 969 (4th Cir. 2009), and *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Dann Ocean Towing, Inc.*, 756 F.3d 314 (4th Cir. 2014). The latter is distinguishable as it involves a federal court sitting in admiralty construing a maritime contract. *Id.* at 319 (holding that "an otherwise valid choice-of-law provision in a maritime contract is enforceable and may require application of a jurisdiction's statute of limitations, in lieu of the doctrine of laches, to govern issues regarding the timeliness of claims asserted under that agreement."). The former is also distinguishable as the issue involving the scope of a choice of law provision was addressed in the context of extra-contractual claims – not as here, in the context of procedural/substantive law issue. *Bunker Holdings*, 346 F. App'x at 973-74.

Most notably, Plaintiff argues that "without regard choice of law provisions" in a choice of law provision "operates to exclude the distinction between substantive and procedural law." (Docket Entry 95 at 22.) Plaintiff has not relied upon any North Carolina precedent that supports this argument.

[4] The agreement in *MedCap* contained a choice of law provision such that Indiana law governed the construction of the contract. 16 F. App'x at 182 n.2.

determined that the statute of limitations is procedural, the Court will determine whether Dr. Stack's claims are barred under North Carolina law.[5]

B. Statute of Limitations

Under North Carolina law, a three-year statute of limitations is imposed for breach of contract claims. N.C. Gen. Stat. § 1-52(1); *Lawley v. Liberty Mut. Grp., Inc.*, No. 5:11-CV-00106-RLV, 2012 WL 4513622, at *2 (W.D.N.C. Sept. 28, 2012). The limitations period typically "begins to run on the date the promise is broken." *Harrold v. Dowd*, 149 N.C. App. 777, 781, 561 S.E.2d 914, 918 (2002) (citation omitted); *see also* N.C. Gen. Stat. § 1-15(a); *Lawley*, 2012 WL 4513622, at *2 (citation omitted) (statute of limitations "begins to run upon the inception of the loss from the contract"); *Pearce v. N. Carolina State Highway Patrol Voluntary Pledge Comm.*, 310 N.C. 445, 448, 312 S.E.2d 421, 424 (1984) ("In a contract action, the statute of limitations

---

[5] Dr. Stack contends that Abbott previously argued that California's statute of limitations was applicable here, which the Court accepted. (Docket Entry 95 at 21-22.) In considering Abbott's motion to dismiss, The Honorable Judge Thomas D. Schroeder, District Court Judge, stated, "[t]he parties agree that the Agreement is governed by California law and therefore appear to agree that its four-year statute of limitations applies." *Stack v. Abbott Labs., Inc.*, 979 F. Supp. 2d 658, 664 (M.D.N.C. 2013). At that stage of the proceeding, the parties did not dispute which governing law applied. Abbott now argues that North Carolina law, not California, governs the issue on the statute of limitations. In his opposition brief, Dr. Stack does not appear to assert that Abbott waived the statute of limitations argument, but rather relies upon the choice of law provision in the Consulting Agreement to argue that the provision must be broadly read to include the statute of limitations. (Docket Entry 95 at 21-22.) The Court has addressed the latter point above. As to the issue of waiver, at least two other circuits have concluded that reliance upon the incorrect choice of law does not waive the statute of limitations argument altogether. *See Zotos v. Lindbergh Sch. Dist.*, 121 F.3d 356, 361 (8th Cir. 1997) (citation omitted) (rejecting the plaintiff's argument that the defendant waived application of a shorter limitation period by relying on a longer limitations in earlier briefing, and further holding that "a federal court is bound to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice"); *Yoder v. Honeywell Inc.*, 104 F.3d 1215, 1224 n.3 (10th Cir. 1997) (holding that defendant "did not waive the statute of limitations defense simply by pleading the defense based on the wrong choice of law"). Here, the undersigned does not find the application of the North Carolina rules governing the statute of limitations (at the summary judgment stage) in conflict with the Court's previous ruling.

begins to run when the contract has been breached and the cause of action has accrued."). "[A]s soon as the injury becomes apparent to the claimant or should reasonably become apparent, the cause of action is complete and the limitation period begins to run. It does not matter that further damage could occur; such further damage is only aggravation of the original injury." *Pembee Mfg. Corp. v. Cape Fear Const. Co.*, 313 N.C. 488, 493, 329 S.E.2d 350, 354 (1985).

Abbott contends that the date the statute of limitations began to run was on February 14, 2007, when Abbott allegedly refused to comply with demands from Dr. Stack regarding payments related to Xience V. (Docket Entry 88 at 16.) The Court previously held that all of Dr. Stack's contract-based claims, including claims for royalty payments, accruing before February 13, 2008, were barred. *Stack*, 979 F. Supp. 2d at 665 & n.2. However, Abbott now asserts that applying North Carolina law, Dr. Stack's claims are barred in its entirety, as the original complaint was filed more than five years after the statute of limitations began to run. (Docket Entry 88 at 6-7.) Assuming *arguendo* that Abbott is right, Dr. Stack's claims for royalty payments in its entirety would be barred by the statute of limitations because the complaint was not filed before February 14, 2010.

The inquiry does not end here, however.

> The general rule in the case of an obligation payable by installments is that the statute of limitations runs against each installment individually from the time it becomes due, unless the creditor exercises a contractual option to accelerate the debt, in which case the statute begins to run from the date the acceleration clause is invoked.

*U.S. Leasing Corp. v. Everett, Creech, Hancock, & Herzig*, 88 N.C. App. 418, 426, 363 S.E.2d 665, 669 (1988) (citation omitted); *see also Martin v. Ray Lackey Enterprises, Inc.*, 100 N.C. App. 349, 357, 396 S.E.2d 327, 332 (1990) (citing omitted); *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, No.

14 CVS 17400, 2015 WL 3823817, at *4 (N.C. Super. June 19, 2015), *appeal dismissed,* 783 S.E.2d 264 (N.C. Ct. App. 2016) (citations and quotations omitted). However, in some cases involving installment contracts, "the statute of limitations clock does not begin to run until the date the last installment payment is due." *Mathis v. Am. Gen. Fin., Inc.,* No. 7:08-CV-73-F, 2009 WL 21532, at *5 (E.D.N.C. Jan. 2, 2009) (citing *Anton A. Vreede, M.D., P.C. v. Koch,* 94 N.C. App. 524, 527, 380 S.E.2d 615, 617 (1989)). Thus, "[t]he latter rule applies when future performance of the contract remains possible despite a material breach. The former rule applies when future performance is not possible; i.e., where an injured party signals his intention to treat the contract as repudiated." *Id.* (citation omitted).

Abbott first contends that the Consulting Agreement is not an installment contract such that the statute of limitations would begin to run upon the due date of each separate installment. The Court notes that this position by Abbott is opposite of what it previously asserted in this matter. (*See* Docket Entry 14 at 15.) In any event, the cases Abbott relies upon are distinguishable here, involving different types of contractual agreements than the Consulting Agreement at issue here. *See Ludlum v. State,* 227 N.C. App. 92, 95, 742 S.E.2d 580, 583 (2013) (emphasis added) (dismissing the plaintiff's "continuing wrong" argument because "plaintiff sought a *declaration* that he was owed any [retirement] benefits at all, not that he has missed payments every month triggering perpetually new statutes of limitation."); *Lawley,* 2012 WL 4513622, at *3 (holding that disability insurance policies have not been treated as installment contracts and that defendant's refusal to pay subsequent monthly payments from disability benefits constituted "continual effects from an original violation" rather than separate and distinct acts); *Liptrap v. City of High Point,* 128 N.C. App. 353, 356, 496 S.E.2d 817,

819 (1998) (finding that "subsequent refusals of the City to pay additional amounts to those plaintiffs [employees] reaching greater increments of service" was not multiple breaches but rather further aggravation of the original injury). Abbott's primary contention is that North Carolina courts have only recognized installment contracts in the context of ongoing, bilateral performance. *See, e.g., Lexington Furniture Indus., Inc. v. Furnco Int'l Corp.*, No. COA09-265, 2009 WL 3351246, at *1-3 (N.C. App. Oct. 20, 2009) (continuing obligations required from the non-breaching party). Abbott asserts that installments contracts outside the statutory definition[6] "involve[] contracts requiring continuing mutual performance from both parties akin to the delivery of 'separate lots' . . . ." (Docket Entry 88 at 18 (citation omitted).) Abbott contends that there was no bilateral performance here, as Dr. Stack's right to a royalty was solely contingent upon compensation for services performed by Dr. Stack prior to December 31, 2010, and Abbott's "alleged act of incorporating Drug Delivery Technology into Xience V before any payments became due in 2007." *Id.* at 18-19; *see also* Consulting Agreement § 1.8. Dr. Stack contends that Abbott's argument is defeated by *Everett* as "there was no recurring mutual performance" by the plaintiff.[7] (Docket Entry 95 at 19.) The Fourth Circuit interpreted *Everett* in *MedCap*, suggesting that labeling on the delivery of a contract was immaterial:

---

[6] *See* N.C. Gen. Stat. § 25-2-612(1) ("An 'installment contract' is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause "each delivery is a separate contract" or its equivalent."). "[A]uthorities have treated agreements falling outside of this definition as installment contracts for statute of limitations purposes." *Christenbury*, 2015 WL 3823817, at *4 (citing cases).

[7] In *Everett*, the parties' agreement involved the leasing of office equipment which appeared to be delivered in one shipment. 88 N.C. App. at 420-22, 363 S.E.2d at 666-67. That court applied the general rule for obligations payable by installments. *Id.* at 426, 363 S.E.2d at 669.

The Hospital also argues that MedCap's reliance on the rule of *Everett* is misplaced because the agreement is not an installment contract. Pointing to the choice of law clause in the agreement stating that Indiana law governs its construction, the Hospital contends that the rule of *Everett* can apply only if the contract is one which requires or authorizes the delivery of goods in separate lots to be separately accepted. Because there was but one delivery of goods in this case, the Hospital argues that there was no installment contract. We believe that the label the Hospital attempts to attach to the agreement is immaterial. North Carolina law governs the running of the statute of limitations and *Everett* attaches no significance to the delivery of goods in separate lots. In fact, *Everett* concerned a lease of office equipment which was apparently delivered in one shipment. Despite the lack of multiple deliveries, the *Everett* court did not hesitate to apply the general rule even though the controversy surrounded only the installment payments.

*MedCap*, 16 F. App'x at 184 (internal quotations and citations omitted).

In considering such, the undersigned concludes that the Consulting Agreement is an installment contract such that there is no need to deviate from the general rule set forth in *Everett*. Because Abbott's obligation required royalty payments in installments, "the statute of limitations runs against each installment individually from the time it [became] due." *Everett* 88 N.C. App. at 426, 363 S.E.2d at 669; *see also Lexington*, 2009 WL 3351246, at *2-3 (interpreting royalty payments in the context of an installment contract); *Starling v. Still*, 126 N.C. App. 278, 485 S.E.2d 74, 78 (1997) (discussing repudiation in the context of an *installment* contract requiring quarterly payments); *Martin*, 100 N.C. App. at 357, 396 S.E.2d at 332 (emphasis added) (applying general rule "where obligations are *payable in installments*, the statute of limitations runs against each installment independently as it becomes due."). To the extent bilateral performance may be material, the Court finds that it exists here as Dr. Stack continued to provide consulting services to Abbott throughout the duration of the contract.[8] (Stack

---

[8] Abbott refutes this by arguing that Plaintiff had no other obligations to receive the alleged royalty payments because such payments would have been for work Dr. Stack had done prior to December

Decl. ¶¶ 21-22, Docket Entry 95-1.) Having found that the Consulting Agreement is an installment contract, the Court now turns to the issue of repudiation.[9] As set forth below, the undersigned finds that there is a genuine issue of material fact as to whether Abbott repudiated the contract. Thus, Abbott's motion for summary judgment should be denied in part.

C. Repudiation

Parties may breach a contract by repudiation. "North Carolina courts have recognized that a repudiation, or anticipatory breach, constitutes an actual breach of contract that triggers the statute of limitations *if* the injured party treats the repudiation as a breach." *Strategic Outsourcing, Inc. v. Cont'l Cas. Co.*, 274 F. App'x 228, 232 (4th Cir. 2008) (emphasis in original) (citing *Vreede,* 380 S.E.2d at 617-18; *Cook v. Lawson,* 3 N.C. App. 104, 164 S.E.2d 29, 32 (1968)).

> Repudiation is a positive statement by one party to the other party indicating that he will not or cannot substantially perform his contractual duties. When a party repudiates his obligations under the contract before the time for performance under the terms of the contract, the issue of anticipatory breach or breach by anticipatory repudiation arises. One effect of the anticipatory breach is to discharge the non-repudiating party from his remaining duties to render performance under the contract.

---

31, 2000. (Docket Entry 96 at 9.) Abbott further argues that Dr. Stack's falsely asserts that Abbott continued to pay annual consulting fees under the Consulting Agreement. (*Id.* at 13.) The amendment to the Consulting Agreement certainly speaks to the timing of payment for Dr. Stack's consulting services, but a plain reading does not in any way suggest that Abbott did not have to provide further consulting services. (*See* Am. to Consulting Agreement ¶ 3, Docket Entry 96-2.)

[9] The Court relied upon application of North Carolina law in rendering an opinion as to whether the parties' agreement is an installment contract. Applying California law, the outcome still remains the same. *See e.g., Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1320-21 (9th Cir. 1998), *as amended on denial of reh'g and reh'g en banc* (June 15, 1998) (analyzing statute of limitations with regard to periodic payment of royalties in an installment contract); *see also Gilkyson v. Disney Enterprises, Inc.*, 244 Cal. App. 4th 1336, 1343, 198 Cal. Rptr. 3d 611, 616 (2016), *review denied* (May 25, 2016) (analyzing application of its "continuous accrual doctrine" in contracts requiring interval performance such as installment contracts and holding that "[t]he continuing nature of the obligation to pay periodic royalties renders each breach of that obligation separately actionable").

> When a party to a contract gives notice that he will not honor the contract, the other party to the contract is no longer required to make a tender or otherwise to perform under the contract because of the anticipatory breach of the first party.

*Profile Investments No. 25, LLC v. Ammons E. Corp.*, 207 N.C. App. 232, 236, 700 S.E.2d 232, 235 (2010) (citation omitted). Repudiation requires "words or conduct evidencing the renunciation or breach [that] must be a positive, distinct, unequivocal, and absolute refusal to perform the contract when the time fixed for it in the contract arrives." *Allen v. Weyerhaeuser, Inc.*, 95 N.C. App. 205, 209, 381 S.E.2d 824, 827 (1989) (internal quotations and citations omitted).[10] "Even a distinct, unequivocal, and absolute refusal is not a breach unless the adverse party treats it as such." *Christenbury*, 2015 WL 3823817, at *5 (citation omitted). Ultimately, "[w]here an individual repudiates his obligations under a contract by clear or unequivocal acts and the adverse party is on notice of the repudiation in such manner that he is called upon to assert his rights, the statute of limitations begins to run from the time the adverse party learned of the repudiation." *Id.* (internal quotations and citation omitted). In cases where repudiation of an installment contract with no acceleration clause occurs, the general rule is inapplicable and "the aggrieved party is not entitled to immediately sue for the *total* amount of the contract, but must wait until each installment becomes due." *Starling*, 485 S.E.2d at 78 (quoting *Taylor v. Taylor Products, Inc.*, 105 N.C. App. 620, 626, 414 S.E.2d 568, 575 (1992)); *see also Lexington*, 2009 WL 3351246, at *2 ("North Carolina jurisprudence is clear that

---

[10] Establishing repudiation under California law is similar. *See Ferguson v. City of Cathedral City*, 197 Cal. App. 4th 1161, 1168, 128 Cal. Rptr. 3d 514, 520 (2011) ("[R]epudiation may be express or implied. An express repudiation is a clear, positive, unequivocal refusal to perform . . . an implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible.").

a party must sue as payments become due, rather than aggregate its claims, when the contract at issue is an installment contract with no acceleration clause.").

Here, there is a genuine issue of material fact as to whether Abbott repudiated the parties' installment contract. Abbott contends that it "consistently and continuously refused to make any payments to Stack owing on Xience V or provide the Xience V revenue data Stack sought." (Docket Entry 88 at 21.) Abbott informed Dr. Stack and his legal team in January 2007 that "it will be necessary for us to discuss the basis for any royalty rate assumption." (John Capek Email, Ex. 3, Docket Entry 88-4 at 2.) Abbott also indicated that it was Abbott's position that "no royalties were due on Xience V." (Ronald D. Devore Dep., Ex. 9, Docket Entry 88-12 at 4-5.) However, in early 2007, communication between Abbott representatives also indicated potential settlement discussions with Dr. Stack and whether Abbott would be able to "take this" in the first or second quarter. (Abbott Email Chain, Ex. E, Docket Entry 95-7.) Dr. Stack did admit in his deposition that Abbott never promised to pay the $480,000 launch payment and royalties if an agreement on a particular lump-sum amount was not met. (Richard S. Stack Dep., Ex. 10, Docket Entry 88-13 at 7.) However, Dr. Stack also indicated that Abbott never told him it would not pay royalties or the launch payment, and that it was his position that "there was never any dispute between the parties that royalties were *due* under the 2001 consulting agreement on Xience." (Stack Dep., Ex. C, Docket Entry 95-5 at 23 (emphasis added)). Abbott's representative, Ronald D. Devore, stated that he was "not aware of a single piece of paper" that Abbott definitively stated that Dr. Stack would not receive royalty payment on Xience V under the Consulting Agreement. ("Devore Dep., Ex. I, Docket Entry 95-11 at 7.) Dr. Stack contends that between 2007 and

2009, himself and Abbott representatives continued discussions to reach "the correct lump-sum buyout amount." (Stack Decl. ¶ 13, Docket Entry 95-1.) "The lump-sum buyout was to include the launch payment for Xience V, royalties for Xience V, and any unpaid royalties for products having Peripheral Technology." (*Id.* ¶ 16.) Dr. Stack further contends that these acts by Abbott do not render clear repudiation, and these acts are not similar in fashion to Abbott's repudiation of its contract with Dr. Stack's collaborator, Dr. Harry Phillips. (*See* Devore Letter, Ex. J., Docket Entry 95-12 (stating that Abbott "does not have any current royalty obligation under the [a]greement")).

Based upon review of the evidence submitted by both parties, there is a genuine issue of material fact as to whether Abbott repudiated the parties' Consulting Agreement. It is unclear whether Abbott words or conduct were unequivocal and an absolute refusal to pay royalties to Dr. Stack. Abbott reliance upon *Christenbury* is unavailing as the defendant's actions in that case were clear as to repudiation of the contract. *See Christenbury*, 2015 WL 3823817, at *5 (clear acts of repudiation where defendants advised the plaintiff of "their intent to market a newer product" and "requested an amendment to the Agreement that [the plaintiff] refused").[11] Because there is a genuine issue of repudiation here, Abbott's motion should be

---

[11] The Court further notes that the issue of repudiation in *Christenbury* was decided without a determination of whether the parties' agreement was an installment contract. 2015 WL 3823817, at *4 ("[T]he Court need not address this issue because the facts disclosed on the face of the Verified Complaint demonstrate either that [p]laintiff waived its rights under the Agreement by its consistent failure to enforce it or that [d]efendants clearly repudiated their obligations to report and make royalty payments pursuant to the Agreement."). Thus, even if the Consulting Agreement was not an installment contract, the genuine issue of material fact as to repudiation would still exist.

denied as to royalty payments accruing within three years of the filing of Dr. Stack's original complaint.[12]

## D. Equitable Estoppel

Dr. Stack asserts that there is a genuine issue of material fact as to whether Abbott should be estopped from arguing the statute of limitations. (Docket Entry 95 at 26-27.) North Carolina courts have outlined the elements for the doctrine of equitable estoppel:

1. Misrepresentation or concealment of material facts[;]
2. Estopped parties' knowledge, either actual or implied, that the representations were untrue when made;
3. Lack of knowledge as to the untruth by the party raising the estoppel;
4. Estopped parties' intent or expectation that misrepresentations will be relied upon;
5. Reliance by party raising estoppel; [and]
6. Prejudice to party raising estoppel.

*Gladden v. Pargas, Inc. of Waldorf, Md.*, 575 F.2d 1091, 1094 (4th Cir. 1978). "Equitable estoppel may be invoked, in a proper case, to bar a defendant from relying upon the statute of limitations." *Duke Univ. v. Stainback*, 320 N.C. 337, 341, 357 S.E.2d 690, 692 (1987) (citation omitted); *Friedland v. Gales*, 131 N.C. App. 802, 806, 509 S.E.2d 793, 796 (1998) (citation omitted) ("The doctrine of equitable estoppel is based on an application of the golden rule to the everyday affairs of men. It requires that one should do unto others as, in equity and good conscience, he would have them do unto him, if their positions were reversed . . . . Its compulsion is one of fair play."). "The party seeking to invoke the doctrine of equitable estoppel must plead facts sufficient to raise an issue as to its application." *Friedland*, 131 N.C. App. at 807, 509 S.E.2d at 797.

---

[12] Having found repudiation as an issue for the trier of fact, the court need not further address the parties' arguments regarding options available once repudiation occurs.

Dr. Stack previously raised this issue and the Court found that "the complaint fail[ed] to plead facts to make an equitable estoppel claim plausible." *Stack*, 979 F. Supp. 2d at 665. The Court then dismissed, without prejudice, Dr. Stack's claims accruing before February 13, 2008 (*id.*), and Dr. Stack thereafter filed an amended complaint. (Docket Entry 38.) Dr. Stack did not allege new facts regarding equitable estoppel, thus it is clear that Dr. Stack failed to plead sufficient facts related to the issue of equitable estoppel. Notwithstanding such, at the summary judgment stage, Dr. Stack's reliance upon information he learned through discovery is insufficient to invoke this doctrine. He argues that despite Abbott's representation that it had no intention of providing Dr. Stack with information necessary to calculate a lump-sum payment (*see* Docket Entry 95 at 26; Devore Dep., Docket Entry 95-11 at 10), Abbott also never indicated that such information would not be provided. (Email Chain, Ex. H, Docket Entry 95-10.) Thus, Dr. Stack contends that Abbott's representations from 2006 to 2009 indicated negotiations between the parties as to lump-sum payments, which would have accounted for past and future Xience V royalty payments; thus, there was no need to pursue legal process. Dr. Stack's basis of Abbott's alleged misrepresentations are continuous negotiations and potential settlement discussions, which is conduct that is not sufficient to invoke equitable estoppel. *Smith v. Murrell*, No. COA03-1373, 2004 WL 2955005, at *6 (N.C. App. Dec. 21, 2004) (rejecting estoppel argument "where the parties merely engaged in negotiations and no assurances of payment or settlement were made"); *Teague v. Randolph Surgical Associates, P.A.*, 129 N.C. App. 766, 772, 501 S.E.2d 382, 387 (1998) ("[The North Carolina Court of Appeals] has previously held that requests for further negotiations or participation in settlement discussions are not conduct which would invoke the doctrine of

equitable estoppel and prevent a party from relying on a statute of limitations defense."); *Duke Univ. v. St. Paul Mercury Ins. Co.*, 95 N.C. App. 663, 673, 384 S.E.2d 36, 42 (1989) ("The parties' participation in settlement negotiations does not alone waive [defendant's] right to assert the statute of limitations."). Thus, Dr. Stack's argument fails.

## III. CONCLUSION

For the reasons stated herein,

**IT IS HEREBY RECOMMENDED** that Defendants' motion (Docket Entry 87) for summary judgment be **GRANTED IN PART AND DENIED IN PART**. As to Plaintiff's claims for royalty payments accruing prior to February 13, 2009, Defendants' motion should be **GRANTED**. As to all other claims, Defendants' motion should be **DENIED**.

 

_____
Joe L. Webster
United States Magistrate Judge

August 24, 2016
Durham, North Carolina