IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| RICHARD S. STACK, M.D., | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | 1:12-CV-148 |
| ABBOTT LABORATORIES, INC., et al., | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

  This is a breach of contract action brought by the plaintiff Dr. Richard S. Stack to recover royalties from the defendant Abbott Laboratories on the sale of stents. Abbott's predecessor and Dr. Stack entered into a contract in 2001 that provides for the payment of royalties to Dr. Stack for products using drug delivery technology substantially developed in whole or in part by, *inter alia*, Dr. Stack and his collaborators. The parties disagree about whether this provision applies to sales of certain drug-eluting stents.

  Abbott has filed a motion in limine asking the Court to exclude evidence of royalty related communications between Abbott and Dr. Stack after Abbott received regulatory approval to sell one such drug-eluting stent known as Xience V[1] in early 2006. Because the written communications between Dr. Stack and Abbott after the approval of Xience V and through June 2007 generally show that the parties discussed the timing of

---

[1] The Court will refer to the disputed drug-eluting stents collectively as "Xience V" for ease of reference.

royalty payments and a potential buyout and that Abbott did not dispute its liability for Xience V royalties, evidence about these communications is relevant and admissible. These communications changed from admissible business negotiations to settlement negotiations excluded by Federal Rule of Evidence 408 at some point after June 2007. While the exact date is not clear, the matter became a dispute no later than July 2008. Therefore, the Court will exclude all communications in and after July 2008, unless some other Rule 408 exception rears its head at trial. The Court will defer ruling on communications after June 2007 and before July 2008 pending the evidence at trial.

## I. Overview

The evidence at issue consists of emails, memos, and oral communications between Abbott and Dr. Stack about Xience V royalties sent and received after Xience V obtained regulatory approval for sale in 2006. This evidence tends to show that after regulatory approval, the parties discussed the timing of royalty payments for Xience V and a potential buyout of future royalties and that Abbott never denied or disputed that it owed Dr. Stack royalties on Xience V under the 2001 contract.[2]

Abbott asserts that the Court should exclude this evidence because (1) the communications are not relevant now that statute of limitations issues are not for trial; (2) they are irrelevant parol evidence; (3) Dr. Stack's statements are hearsay; and (4) the communications were part of settlement negotiations between Abbott and Dr. Stack.

---

[2] Abbott has contrary evidence from witnesses about oral communications beginning at some point in 2007, but it does not dispute that there are no written communications in which anyone at Abbott told Dr. Stack that it disputed the fact that royalties were due on Xience V. (*See* Doc. 95-11 at 7, 13-14).

2

(Doc. 137 at 20-24). Dr. Stack contends that the evidence is relevant to show how the parties mutually interpreted the ambiguous contract language before the dispute arose, that the communications are either admissions by Abbott or are not offered for the truth of the matter asserted, and that the communications were not part of settlement negotiations. (Doc. 161 at 17-23).

## II. Relevance

Abbott contends that this evidence is no longer relevant because it will not proceed on its statute of limitations and repudiation defense at trial and because the court granted summary judgment in its favor on equitable estoppel. (Doc. 137 at 20-21). However, these are not the only issues for which the post-approval evidence is relevant.

Statements made by Abbott and Dr. Stack after the regulatory approval of Xience V reflect the parties' understanding of the contract and course of performance. (*See, e.g.*, Doc. 140-9 (stating understanding of Drug Delivery Technology); Doc. 140-12 (describing the DES royalty rate); Doc. 161-17 (providing model for royalties on royalty bearing products)). These communications are particularly relevant to this dispute, which involves the interpretation of ambiguous terms in the 2001 contract. (*See* Doc. 137 at 7-15 (discussing potentially ambiguous terms); Doc. 142 (same)); *see also Emp'rs Reinsurance Co. v. Superior Court*, 74 Cal. Rptr. 3d 733, 745 (Cal. Ct. App. 2008) (noting that when interpreting an ambiguous contract, the court should give great weight to "the acts and conduct of the parties with knowledge of [the contract's] terms, before any controversy has arisen"). This evidence is relevant.

3

### III. Parol Evidence

The parol evidence rule excludes the introduction of prior or contemporaneous agreements that contradict the terms of the contract. Cal. Civ. Proc. Code § 1856(a). It does not apply here because these post-approval communications began in 2006, (*e.g.*, Doc. 137 at 20), several years after Abbott and Dr. Stack finalized the 2001 contract, (Doc. 161-1). These communications are admissible evidence of the parties' course of performance under the contract. *See* § 1856(c).

Furthermore, California contract law allows the court to consider extrinsic evidence both to determine whether the contract is ambiguous and to resolve that ambiguity.[3] *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 646-47 (Cal. 1968); *Wolf v. Walt Disney Pictures and Television*, 76 Cal. Rptr. 3d 585, 601-02 (Cal. Ct. App. 2008). If the contract is ambiguous and if its meaning turns on the credibility of evidence, the evidence must be submitted to the fact-finder. *Wolf*, 76 Cal. Rptr. 3d at 602-03.

### IV. Hearsay

Abbott contends that post-approval statements made by Dr. Stack to people at Abbott are inadmissible hearsay.[4] (Doc. 137 at 22-23). Abbott also contends that Dr. Stack's characterizations of the agreement more than four years after signing the contract

---

[3] California contract law does not allow the court to consider extrinsic evidence "to vary or contradict the clear and unambiguous terms of a written, integrated contract." *Wolf*, 76 Cal. Rptr. 3d at 601-02; *accord Pac. Gas & Elec. Co.*, 442 P.2d at 645.

[4] Statements made by agents of Abbott qualify as admissions and are not hearsay. *See* Fed. R. Evid. 801(d)(2).

are "self-serving, post hoc, interpretation[s]," which do not reflect "the mutual intention of the parties as it existed at the time of contracting." (*Id.* at 21-22 (citing Cal. Civ. Code § 1636)). Dr. Stack contends that his statements are not hearsay because he does not offer them for "the truth of the matter asserted," but rather to show how Abbott responded to Dr. Stack's communications. (Doc. 161 at 19-20); *see* Fed. R. Evid. 801(c)(2).

For the most part, the post-approval written communications from Dr. Stack to Abbott are short, do not contain explanations or justifications by Dr. Stack for why he is due royalties on Xience V, and are needed to provide context for the admissions contained in Abbott's responses to the written communications. (*See, e.g.*, Docs. 161-9, 161-10). As to this type of communication, the motion in limine will be denied. Upon request, the Court will give the jury an appropriate limiting instruction.

As to testimony about Dr. Stack's oral statements to Abbott during this time frame and a fax from Dr. Stack to John Lapke dated March 14, 2006, (Doc. 140-9), the Court will defer ruling. The March 2006 Lapke fax contains several sentences in which Dr. Stack characterizes and summarizes the contract; it does not appear to have resulted in any written response from Abbott. (*See id.*). It is not clear that this fax will be necessary to give context to any admissions by Abbott, and the Court has some Rule 403 concerns. If and when Dr. Stack seeks to testify about this fax, he shall advise the Court outside the presence of the jury.

The Court has similar concerns about any testimony by Dr. Stack about oral statements he made to Abbott representatives. Such testimony will likely be admissible if

5

the oral statements by Dr. Stack about the meaning of the contract are short and non-argumentative and will likely be excluded if they are long-winded, self-serving, or *post hoc* expositions on the meaning of the contract, if they did not result in a response from Abbott or are otherwise offered for their truth, or if they reflect a dispute with Abbott. *See* discussion *infra* on Fed. R. Evid. 408. Abbott should object at trial to such questions and answers.

V.     **Settlement Negotiations**

Finally, Abbott contends that these communications were settlement negotiations that are inadmissible under Federal Rule of Evidence 408. (Doc. 137 at 23-24). Dr. Stack counters that until April 2009 there was no dispute to settle and that these communications were business negotiations, to which Rule 408 does not apply. (Doc. 161 at 21-23).

Rule 408 requires courts to exclude evidence of offers, conduct, or statements "made during compromise negotiations" when offered "to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a)(2). It does not apply to statements or conduct offered, *inter alia*, to rebut contentions of undue delay. *Id.* at 408(b). To the extent Abbott implies at trial that Dr. Stack's claim or testimony is not credible because of his undue delay in bringing suit, then Rule 408 will not apply and all post-approval statements and conduct by Abbott will be admissible, subject to Rule 403.

If Abbott avoids indicating undue delay by Dr. Stack, the purpose of the post-approval statements and conduct would be to prove the validity of Dr. Stack's claim. Indeed, Dr. Stack contends that Abbott's conduct and statements after Xience V received

6

regulatory approval constitute admissions that it owed Dr. Stack royalties on Xience V. (*See, e.g.*, Doc. 95 at 10-13). Thus he seeks to use this conduct and these statements to prove the validity of his claim.

However, Rule 408's prohibition does not come into play merely because a party offers the evidence to prove the validity of a claim. The statements must have been made or the conduct must have occurred at a time when there was a real controversy over the validity or the amount of the claim. *See Bituminous Constr., Inc. v. Rucker Enters., Inc.*, 816 F.2d 965, 968 (4th Cir. 1987) (stating that "Rule 408 requires exclusion of evidence concerning offers to compromise or settle *disputed* claims") (emphasis added). While the exclusionary provision of Rule 408 is not dependent on a threat of litigation, it is dependent on the existence of a dispute. *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 390 (4th Cir. 2015) (Wynn, J., concurring); *Weems v. Tyson Foods*, 665 F.3d 958, 965 (8th Cir. 2011); *ECEM European Chem. Mktg. B.V. v. Purolite Co.*, 451 F. App'x 73, 77 (3d Cir. 2011).

Thus, the exclusionary principle in Rule 408(a) "does not apply to statements made before a controversy has arisen." 2 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 4:58 (4th ed. 2016); *see Archer Daniels Midland Co. v. Brunswick Cty.*, 129 F. App'x 16, 24 n.12 (4th Cir. 2005) (unpublished) ("Courts surely need not exclude *all* inter-party questions and discussions about a contract; the probative value of such evidence is quite high . . . ."). Nor does it "apply to statements made in a setting in which the parties are in apparent agreement on the nature and extent of their obligations toward one another." Mueller & Kirkpatrick, *supra*, at § 4:58. Evidence of mere

7

business negotiations made before such a dispute arises is admissible. *See Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *6 (W.D. Mich. Oct. 31, 2011) (Scoville, M.J.).

Under Federal Rule of Evidence 104(a), the court decides the preliminary question of whether or not there was a "disputed claim" to determine if this evidence is admissible under Rule 408. *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1354 (11th Cir. 2011); *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2d Cir. 1992). The party moving to exclude the evidence, *i.e.*, Abbott, bears the burden of proving there was a dispute sufficient to trigger Rule 408. *See Raybestos Prods. Co. v. Younger*, 54 F.3d 1234, 1241 (7th Cir. 1995) (requiring "substantial showing" of settlement attempt).[5]

The evidence presently before the Court[6] indicates that the initial discussions between Dr. Stack and Abbott concerned the timing of the royalty payments and the feasibility and amount of a potential buyout via a one-time payment in lieu of the

---

[5] The Court finds persuasive a line of district court decisions interpreting *Raybestos* to place the burden of establishing the existence of a dispute on the party seeking to exclude the evidence. *See, e.g.*, *Baker Hughes, Inc. v. S & S Chem., LLC*, No. 1:14-cv-531, 2015 WL 5547751, at *4 (W.D. Mich. Sept. 18, 2015); *Weitz Co. v. MH Wash., LLC*, No. 06-0559-CV-W-DGK, 2008 WL 8625900, at *2-3 (W.D. Mo. Sept. 15, 2008); *United States v. Mirama Enters., Inc.*, 185 F. Supp. 2d 1148, 1156 (S.D. Cal. 2002).

[6] To determine whether and when the discussions shifted from business negotiations to discussions about a disputed claim, the Court has considered the written communications between the parties during this time frame and certain deposition testimony about these communications to which the parties directed the Court's attention. The Court has limited itself to the evidence specifically referenced and submitted in support, (Doc. 137 at 20-24), and opposition, (Doc. 161 at 17-23), to this motion and to evidence referenced by Judge Webster in his recommendation in connection with repudiation and equitable estoppel. (Doc. 106 at 15-16, 18). The Court has not otherwise scoured the record. *See Aikens v. Ingram*, 652 F.3d 496, 506 (4th Cir. 2011) (en banc) (Diaz, J., concurring); *cf. Arnott v. United States*, 464 U.S. 948, 949-50 (1983) (White, J., dissenting from denial of certiorari).

ongoing royalty payments required by the contract. (*See, e.g.*, Docs. 140-10; 140-12). Dr. Stack affirmatively testified that no one at Abbott ever told him there was a dispute about his entitlement to Xience V royalties. (*E.g.*, Doc. 95-5 at 15). Abbott has not identified any document in which it affirmatively stated that it did not intend to pay Dr. Stack such royalties or in which it directly questioned his entitlement to such royalties. Indeed, Ronald Devore, in-house counsel for Abbott, testified that he was "not aware of a single piece of paper" that informed Dr. Stack that he would not receive a royalty on Xience V. (Doc. 95-11 at 7). Dr. Stack asserts that Abbott's internal communications discussed models of Xience V revenues and projections of future sales as they tried to determine an appropriate one-time royalty buyout. (Doc. 161 at 21-22 (citing *e.g.*, Docs. 161-17, 161-18)). These documents relate to a buyout negotiation, and do not indicate that there was a dispute over whether royalties were owed.

Abbott points to two documents that refer to attempts to "settle," (Doc. 137 at 23 (citing Docs. 140-12, 140-10 at 4)), and to another document in which Abbott states a need "to discuss the basis for any royalty rate assumptions." (Doc. 163 at 132 (referring to Doc. 161-10 at 3)). Viewed in context, however, the Court understands these as references to settling the buyout negotiations, rather than settling a dispute. Abbott's internal communications indicate an effort to lower the buyout amount, (Doc. 140-10 at 4), and concerns about when Abbott would make such a payment, (Doc. 161-16 at 2); they do not reveal an ongoing liability dispute. (*See* Doc. 161-15). These documents through mid-summer 2007 overwhelmingly indicate business negotiations over a buyout amount, not a dispute over whether Dr. Stack was entitled to royalties at all. Moreover,

9

Abbott has not directed the Court's attention to any direct evidence that during this time frame it informed Dr. Stack that there was a dispute over its obligations under the 2001 contract for Xience V royalties.[7]

There is such evidence, however, beginning in the summer of 2007. Mr. Devore testified that he explicitly told Dr. Stack that Abbott would not pay a royalty on Xience V during a meeting sometime after June 11, 2007. (Doc. 95-11 at 12-15).[8] As noted *supra*, Dr. Stack disputes this. (*See* Doc. 95-5 at 15, 20). There is little documentary evidence over the course of the following year. Beginning in the summer of 2008, the record is clear that the matter had blossomed into a dispute. Dr. Stack's privilege log marks several July 2008 communications as protected under the work product doctrine, demonstrating that Dr. Stack anticipated litigation at that time. (Doc. 140-11 at 6); *see United States v. Nobles*, 422 U.S. 225, 237-38 (1975). Communications in November 2008 between the parties reflect that Abbott had asked Dr. Stack for proof of his role in

---

[7] Abbott points to a general reference by the magistrate judge describing the communications from 2006-2009 as "continuous negotiations and potential settlement discussions." (Doc. 137 at 23 (citing Doc. 106 at 18)). The magistrate judge also specifically characterized one email chain during 2007 as "potential settlement discussions." (Doc. 106 at 15). In neither reference did the magistrate judge make preliminary findings of fact in connection with an evidentiary ruling and nor did he consider the question of whether and when business negotiations became settlement negotiations.

[8] The timing of the meeting is unclear from Mr. Devore's cited deposition testimony. (*See* Doc. 95-11 at 12-15). As best the Court can tell, the meeting in which Mr. Devore purportedly informed Dr. Stack that Abbott owed no royalties for Xience V occurred after the June 2007 email exchange that included discussions between Dr. Stack and Abbott on sales projections for drug-eluting stents. (*See* Doc. 161-15). It is possible the meeting happened somewhat earlier. However, the Court's decision is not based on Mr. Devore's testimony or Dr. Stack's testimony, but rather turns on the emails.

"invention and technology development" for Xience V. (Doc. 161-12). In 2009 emails to Abbott, Dr. Stack expressed increasing frustration with Abbott's failure to provide information he needed to continue discussions. (Doc. 161-13 at 1).

Based on this evidence, the Court finds that Abbott has not established that post-approval communications through June 2007 concerning royalty payments for Xience V were "made during compromise negotiations." *See* Fed. R. Evid. 408. Subject to evidence at trial, such communications will not be excluded under Rule 408.[9]

Abbott has, however, established that all such communications after July 2008 were made in settlement negotiations for a disputed claim under Rule 408. Assuming Abbott does not raise the issue of undue delay, that no other exception to Rule 408 applies, and that these communications do not become relevant to prove or rebut some other point unrelated to the validity of Dr. Stack's claim, such evidence will be excluded under Rule 408.

As to evidence of communications between June 2007 and July 2008, the record is not clear. As Abbott bears the burden of proof on the motion, it would be appropriate to deny the motion as to these communications. In view of the strong policy reasons behind Rule 408, the Court in its discretion will defer ruling. If and when Dr. Stack is ready to offer such evidence, he shall advise the Court outside the presence of the jury.

---

[9] It is possible that Dr. Stack's testimony and evidence at trial might make re-evaluation of this date appropriate. If Abbott believes such re-evaluation is appropriate, it may object at that time.

11

It is **ORDERED** that Abbott's motion in limine, (Doc. 137 at 20-24), is **GRANTED in part, DENIED in part, and is otherwise DEFERRED.** For the time frame after regulatory approval through June 2007, the Court **DENIES** the motion to exclude statements and conduct by Abbott and, to the extent necessary to provide context for Abbott's responses and conduct and excluding Doc. 140-9, statements and conduct by Dr. Stack. The Court **GRANTS** the motion for communications made in and after July 2008. As to communications made after June 2007 and before July 2008, and as to Doc. 140-9, the Court **DEFERS** its decision until trial.

This the 27th day of October, 2016.

_____
UNITED STATES DISTRICT JUDGE